UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NICOLE CYR, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 09-cv-30077-MAP |
| | ) | |
| UNITED PARCEL SERVICE INC., | ) | |
| Defendant | ) | |

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. No. 30)

June 16, 2011

PONSOR, D.J.

## I.   INTRODUCTION

Plaintiff, Nicole Cyr, filed a six-count complaint against her former employer, Defendant United Parcel Service Inc. ("UPS"), alleging disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., and Mass. Gen. Laws ch. 151B, and retaliation in violation of 42 U.S.C. § 2000e-3 and Mass. Gen. Laws ch. 151B, § 4.  Defendant has moved for summary judgment on all counts.  For the reasons set forth below, the court will allow the motion in part and deny the balance.

## II.  FACTS

In 2000, Plaintiff began work with Defendant as a Field Support Technician,[1] in its facility in Waterbury, Connecticut.  Four years later, in November 2004, Plaintiff was diagnosed with multiple sclerosis ("MS").  Although her physician placed no restrictions on her ability to work, Plaintiff informed her manager, Christopher Welburn, of her diagnosis and provided him with a physician's note, dated November 4, 2004, which stated in full: "Please be advised that Nicole Cyr has multiple sclerosis.  She may have 'good' days as well as 'bad' days."  (Dkt. No. 35, Ex. 31 at 16.)

On November 18, 2004, Mr. Welburn reached out to Maryann Barone, a nurse employed by Defendant, to inform her of Plaintiff's diagnosis and inquire about his managerial responsibilities.  (Dkt. No. 35, Ex. 13.)  Mr. Welburn testified that, although he was unaware of any formal process regarding workplace accommodations, he sought advice because he wanted to "make sure there is nothing that allows [Plaintiff] not to be successful."  (Dkt. No. 35, Ex. 4, Welburn Dep. 38:17, 43:19-22.)  Ms. Barone, Mr. Welburn, and Plaintiff together discussed the need for flexible

---

[1] Field Support Technicians respond to customer calls about computer-related issues.  Some of their work is in the office and some involves travel for repairs and delivery of computer equipment.

scheduling of days off, and Plaintiff expressed that she was having difficulty driving long distances. (Dkt. No. 35, Ex. 13.)

Shortly thereafter, at her request, Mr. Welburn relocated Plaintiff to Defendant's office in West Springfield, Massachusetts, which significantly reduced her commute. (Dkt. No. 35, Ex. 2, Cyr Dep. 87:3-4.) However, in West Springfield, the Technical Support Group ("TSG") office was located on the second floor, and Plaintiff soon reported to Mr. Welburn that she was experiencing difficulties climbing the stairs repeatedly throughout the day. (Id. at 87:16-18.) Mr. Welburn arranged a meeting for himself and Plaintiff with Ms. Barone and another UPS nurse, Betty Pobliego. (Id. at 84:1-4.) On January 28, 2005, Mr. Welburn sent an email to Plaintiff documenting the results of this meeting, specifically that Plaintiff's travel would be limited; that, while driving, she should take breaks for "stretch time" when necessary; that she would be moved from the second-floor office to a "TSG hut" on the first floor; that she would be given a hand-cart to assist with delivering packages; and that she should "[r]equest assistance from UPS and customers as needed." (Dkt. No. 35, Ex. 14.) Mr. Welburn also indicated that he would discuss these accommodations with Plaintiff's supervisor, Michael

Gobin.  (Id.)  Plaintiff testified that Defendant followed
through immediately with all of these accommodations.  (Dkt.
No. 35, Ex. 2, Cyr Dep. 85:12-99:17.)

For the next two years, 2005 and 2006, Plaintiff worked
successfully with these informal accommodations.  Although a
May 2005 physician's note recommended that Plaintiff should
avoid lifting more than twenty-five pounds, there is no
evidence that her ability to perform her job was impacted by
this limitation.  (Dkt. No. 35, Ex. 31 at 18.)  In fact,
despite some performance issues that were unrelated to her
disability, in 2006 Plaintiff received a promotion and a
raise.  (Dkt. No. 35, Ex. 6, Charest Dep. 33:22-24.)

In early 2006, Warren Charest replaced Christopher
Welburn as Plaintiff's manager.  Mr. Charest testified that
he was unaware of Plaintiff's specific diagnosis but stated
that it was "general knowledge" that her "conditions came
and went."  (Dkt. No. 35, Ex. 6, Charest Dep. 25:21, 26:7-
8.)  Although Mr. Welburn's 2005 email describing
Plaintiff's accommodations was not in Plaintiff's employee
file, Mr. Charest acknowledged that he was aware that Mr.
Welburn had "some sort of agreement with [Plaintiff] that
there would be accommodations" and believed that if
Plaintiff had problems driving, lifting, or doing her job,
"she would let us know."  (Id. at 10:16-18, 22:9-13.)

In the fall of 2006, George Gessner replaced Mr. Charest as Plaintiff's manager, but he did not meet her until early 2007 when a reconstruction plan calling for demolition of the first-floor TSG hut circulated among employees. Plaintiff approached her supervisor, Mr. Gobin, with concerns about her potential relocation to the second floor. Mr. Gobin testified that this was the first time that he learned that Plaintiff had been provided with accommodations. (Dkt. No. 35, Ex. 5, Gobin Dep. 32:3-8.) Mr. Gobin then raised Plaintiff's concerns with Mr. Gessner, who testified that this was the first time that he learned that Plaintiff had either accommodations or multiple sclerosis. (Dkt. No. 32, Ex. 3, Gessner Dep. 15:15-17.)

Upon examining Plaintiff's file, Mr. Gessner found only the November 2004 doctor's note concerning "good" days and "bad" days, whereupon he contacted Renee Solomon, Defendant's Occupational Health Supervisor, who informed him that Defendant would need documentation about Plaintiff's disability in order to process any formal requests for accommodations pursuant to the Americans with Disabilities Act ("ADA"). (Id. at 20:1-3.) Ms. Solomon advised him that "he really shouldn't be making those accommodations without guidance." (Dkt. No. 35, Ex. 8, Solomon Dep. 23:1-5.) On March 9, 2007, Ms. Solomon sent Plaintiff the necessary

documents to commence a formal ADA accommodations process, including forms to be completed by Plaintiff's physician. (Dkt. No. 35, Ex. 17.)

In the meantime, the construction had not yet begun, and Plaintiff's job remained unchanged. On April 12, 2007, Mr. Gobin conducted a previously scheduled eight-hour "on-the-job observation" ("OJO") of Plaintiff, which supervisors were required to conduct with their employees twice a year. Although the OJO report demonstrates generally that Plaintiff was meeting all job expectations (Dkt. No. 35, Ex. 19), Mr. Gobin testified that during the OJO, Plaintiff complained of tingling in her arm and was unable to carry a piece of equipment up the stairs. (Dkt. No. 35, Ex. 5, Gobin Dep. 11:1-3.) Mr. Gobin did not include this incident in his OJO report, and Plaintiff denies that it occurred. (Dkt. No. 35, Ex. 2, Cyr Dep. 136:15-19.)

That same day, Mr. Gobin took Plaintiff to Friendly's for lunch and a "Talk, Listen, Act" ("TLA") meeting, also a standard meeting that supervisors held with their individual employees. (Dkt. No. 35, Ex. 5, Gobin Dep. 17:7-12.) Mr. Gobin's contemporaneous TLA report states:

> [Plaintiff] said that she wants to get out of TSG. She has MS and feels that she is becoming incapable of handling the TSG work from a physical and mental state because of her illness. She has an application she is submitting for the ADA evaluation and will be meeting her doctor on April

6

> 19 to have him list her restrictions. I told her
> we need to await the results of her ADA
> application before we could put her at less than
> full duty.

(Dkt. No. 35, Ex. 20.)  According to Plaintiff, however, she did <u>not</u> tell Mr. Gobin that her MS was interfering with her ability to do her job and only mentioned again her concern about moving to the second floor.  (Dkt. No. 35, Ex. 2, Cyr Dep. 126:23-24.)  Plaintiff also stated that at the TLA meeting, she informed Mr. Gobin that there was an office on the first floor that she thought she could share with its current occupant, but Mr. Gobin never followed up on this. (<u>Id.</u> at 128:1-20.)

Two weeks later, on April 26, 2007, Plaintiff's neurologist, Dr. Michael Krinsky, faxed a letter to Defendant's Human Resources Department stating that Plaintiff "has been advised to avoid any lengthy, steep stairs and especially repetitive use in any given day." (Dkt. No. 35, Ex. 31 at 17.)  That same day, Plaintiff complained to Mr. Gobin about numbness in her arm.  He suggested that she go home early, but she declined, so he recommended that she not lift anything for the remainder of her shift.  (Dkt. No. 35, Ex. 5, Gobin Dep. 31:19-25.)

The following day, April 27, 2007, Plaintiff took the day off "because of her physical condition."  (<u>Id.</u> at 31:2-4.)  On or about this same day, Mr. Gessner contacted Ms.

Solomon, stating that because Plaintiff had yet to return the ADA forms, he "was concerned that Nicole would go out of work with an injury . . . I am not able to manage the situation because I do not know what restrictions Nicole has." (Dkt. No. 35, Ex. 21.)

Ms. Solomon contacted Defendant's Human Resources Manager Diane Hagi, and, with Mr. Gessner, they determined that Plaintiff should take a short-term disability leave until her ADA paperwork was filed. (Dkt. No. 35, Ex. 7, Gessner Dep. 31:20-22.) Mr. Gessner testified that he was particularly concerned because Plaintiff worked the night shift and was thus alone much of the time with no one to help her. (Id. at 28:22-29:1.) He worried that "she could get paged in the middle of the night, have to drive, have to lift, have to climb up and down stairs. And short of having a supervisor on at that hour of the night, I didn't have any way to keep her from getting dispatched." (Id. at 33:9-14.) Although no safety incidents had occurred, he stated that "there were situations where she was asked to do things which she said she wasn't able to do [because of her medical condition]." (Id. at 44:1-5.)

On April 30, Mr. Gessner, Ms. Solomon, and Ms. Hagi met with Plaintiff to inform her that they were placing her on short-term disability leave until she filed her ADA

paperwork because they were concerned about her safety with respect to driving and lifting. (Dkt. No. 35, Ex. 2, Cyr Dep. 133:5-134:9.) Mr. Gessner wrote a memorandum documenting this meeting, which also included Plaintiff's complaints of numbness in her left and right sides, her inability to drive for more than thirty minutes without stopping, her difficulty climbing and descending stairs, and her difficulty lifting. (Dkt. No. 35, Ex. 21.) After the meeting, Plaintiff forwarded a copy of Mr. Welburn's January 2005 email to Mr. Gessner.

On May 14, 2007, Dr. Krinsky sent Ms. Solomon the ADA paperwork, in which he diagnosed Plaintiff with MS and bilateral carpal tunnel syndrome. (Dkt. No. 32, Ex. 8.) After reviewing Plaintiff's job description, Dr. Krinsky opined that Plaintiff was not able to perform the functions of her position because she was unable to lift seventy pounds, perform repetitive fine-hand manipulation and grasping, sit for long periods, climb stairs, or push or pull levers on equipment. He specifically noted that Plaintiff's disabilities did not prevent her from performing major life activities other than working. (Id.)

On June 11, 2007, Plaintiff met with Ms. Solomon and Workforce Planning Manager Nancy Pistritto. She filled out an accommodations checklist, describing her "desired

accommodations" as limited driving to under thirty minutes, a first-floor office, and assistance with lifting packages over twenty pounds.  (Dkt. No. 35, Ex. 24.)  At this meeting, Plaintiff was informed that she could not return to her former position because it required the ability to lift seventy pounds and to climb stairs repeatedly due to the location of the office.  (Dkt. No. 35, Ex. 2, Cyr Dep. 144:2-5.)  Also at this meeting, Ms. Solomon and Ms. Pistritto referenced Mr. Welburn's 2005 email and indicated that they understood why Plaintiff believed that she had been given accommodations.  (Id. at 148:2-6.)

From August 2007 through May 2008, Plaintiff was on disability leave and was sent notifications of job openings at Defendant's various locations from Ms. Pistritto on a biweekly basis.  (Dkt. No. 35, Ex. 26 at 17-47.)  On June 4, 2008, Ms. Pistritto accepted Plaintiff's resignation.

### III. DISCUSSION

A.  Legal Standard.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

10

The burden then shifts to the opposing party who must demonstrate that a reasonable jury could return a verdict in its favor based on the evidence.  Id.  "A party opposing summary judgment must present definite, competent evidence to rebut the motion."  Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (citations omitted).

B.  Counts I and IV: Disability Discrimination Claims.

Plaintiff has alleged that Defendant discriminated against her based on her disability in violation of 42 U.S.C. §§ 12101 et seq. and Mass. Gen. Laws ch. 151B, § 4(16).  Because "Chapter 151B is considered the 'Massachusetts analogue' to the federal Americans with Disabilities Act," the court's analysis under federal and state law is the same.  Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 153 (1st Cir. 2010) (quoting Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d 30, 32 & n.1 (1st Cir. 2001)).  To establish a prima facie case of disability discrimination, Plaintiff must prove: "(1) that she was 'disabled' within the meaning of the ADA; (2) that she was able to perform the essential functions of her job with or without accommodation; and (3) that she was discharged or adversely affected, in whole or in part, because of her disability."  Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 82 (1st Cir. 2008).

1.  <u>Prong One: Disability</u>.

To prove that she is disabled under the ADA, Plaintiff must demonstrate that she has "a physical or mental impairment which substantially limits one or more of [her] major life activities" or that she is "regarded as having such an impairment." 42 U.S.C. § 12102(1). "It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." <u>Toyota Motor Mfg., Inc. v. Williams</u>, 534 U.S. 184, 198 (2002). Plaintiff argues both that she is disabled and that Defendant regarded her as disabled. Defendant, while acknowledging that multiple sclerosis is an impairment, see 29 C.F.R. 1630.2, contends that Plaintiff is unable to show either that she was disabled or that Defendant regarded her as having an impairment that substantially limited any of her major life activities.

"The ADA does not define 'substantially limits,' but 'substantially' suggests 'considerable' or specified to a large degree." <u>Carreras v. Sajo</u>, 596 F.3d 25, 33 (1st Cir. 2010) (citations omitted). Without question, "[t]o be substantially limiting, an impairment must cause a person . . . to be significantly restricted in the performance of a particular major life activity as compared to an average

person in the general population." Id. at 33. To survive a motion for summary judgment, a "'plaintiff must proffer evidence from which a reasonable inference can be drawn that a [major life] activity is substantially or materially limited.'" Gillen v. Fallon Ambulance Serv., 283 F.3d 11, 24 (1st Cir. 2002) (quoting Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1207 (8th Cir. 1997)).

The only pertinent medical evidence in the record is Dr. Krinsky's May 14, 2007, report, in which he diagnosed Plaintiff with MS and carpal tunnel syndrome and opined both that Plaintiff could not perform all the functions of her job and was not substantially limited in her ability to perform any major life activities. (Dkt. No. 32, Ex. 8.) However, Plaintiff's own testimony provides ample evidence of the substantially limiting nature of her impairments.

Plaintiff testified that on most days, she is able to walk about a quarter mile, lift her thirty-pound daughter, drive for about thirty minutes at a time, and stand for about thirty minutes. (Dkt. No. 35, Ex. 2, Cyr Dep. 42:4-43:16.) However, on the days when her MS "flares up," Plaintiff testified that she is able to walk but with difficulty, has trouble balancing, is essentially unable to climb stairs, must urinate as often as every thirty minutes, has trouble lifting her daughter, and does not leave her

home.  (Id. at 51:12-14, 72:21-73:14.)  Plaintiff testified
that in 2007, her MS flared up about twelve times between
January and April.  (Id. at 73:22-24.)

     "An impairment that is episodic . . . is a disability
if it would substantially limit a major life activity when
active."  42 U.S.C. § 12102(D).  As indicated by Plaintiff's
testimony, the major life activities that are impacted by
her MS are walking, standing, lifting, and working.  Id. §
12102(2)(A).  Additionally, the major bodily functions that
are related to her MS include the operation of her bladder.
Id. § 12102(2)(B).  The question then is whether these major
life activities are substantially limited when Plaintiff is
suffering from an MS flare-up.  Essential to the court's
analysis, here, is the ADA's focus on "'substantial
limitations'" as opposed to "'utter inabilities.'"  Gillen,
283 F.3d at 22 (quoting Bragdon v. Abbott, 524 U.S. 624, 641
(1998)).  "[W]hen an impairment results in significant
limitations, that impairment is substantially limiting even
if the limitations are not insurmountable."  Id.

     Here, the court must conclude that Plaintiff has
offered sufficient "evidence that the extent of the
limitation caused by [her] impairment in terms of [her] own
experience is substantial."  Toyota Motor Mfg., Inc., 534
U.S. at 198.  Plaintiff's uncontested description of her

medical condition during her flare-ups is evidence from
which a reasonable jury could find that she faces serious
obstacles and is substantially limited in a number of major
life activities.  While Dr. Krinsky presented one opinion
regarding Plaintiff's ability to perform major life
activities, "courts should assess the objective
reasonableness of the views of health care professionals
without deferring to their individual judgments."  <u>Bragdon</u>,
524 U.S. at 650.  Moreover, Dr. Krinsky's testimony that
Plaintiff's condition was "functional" but with "persistent
defects" is consistent with her description of her
limitations.  (Dkt. No. 32, Ex. 2, Krinsky Dep. 27:24-25.)

Thus, the court finds that Plaintiff has presented
sufficient evidence to support her contention that she is
substantially limited in her ability to perform major life
activities.  Having so determined, the court need not
address the parties' arguments concerning whether Plaintiff
was regarded as disabled and will proceed directly to the
remainder of the prima facie disability analysis.

> 2.  <u>Prongs Two and Three: Ability to Perform Essential
> Functions of the Job and Adverse Employment
> Action</u>.

Apparently so convinced that Plaintiff was not
substantially limited in any major life activities,
Defendant has offered no further argument in support of its

15

motion for summary judgment on Plaintiff's disability
discrimination claims, Counts I and IV.  Having considered
all of the evidence in the light most favorable to
Plaintiff, the court finds that Plaintiff's 2006 raise and
promotion and her generally favorable performance review in
April 2007 sufficiently support her claim that she was able
to perform the essential functions of her job with the
informal accommodations described in Mr. Welburn's January
2005 email.[2]  See 42 U.S.C. § 12111(8) (noting that second
prong of disability analysis requires determination whether
Plaintiff is "an individual who, with or without reasonable
accommodation, can perform the essential functions of the
employment position that [she] holds or desires").

     With respect to the third prong, Plaintiff bears the
burden of proving that the adverse employment action taken
against her was due to her disability.  As a threshold
matter, Defendant has not argued that its decision to place

-------------------------------------------

     [2] The evidence that could be viewed in Defendant's favor,
at best, raises a genuine issue of material fact as to
Plaintiff's ability to work and, at worst (from Defendant's
perspective), supports Plaintiff's contention that she was
able to work.  Mr. Charest testified that Plaintiff received
her raise and promotion not because she was performing her job
well but because Defendant's policy is that after two years of
work, Field Support Technicians must either be promoted or
fired.  (Dkt. No. 35, Ex. 6, Charest Dep. 33:22-24.)  Based on
this, a jury could find that, when given the opportunity to
terminate her, Defendant found Plaintiff's work performance
adequate.

Plaintiff on short-term disability leave was not an adverse employment action, and the court finds for purposes of this ruling that it was.  With regard to the reason for the action, the evidence cited above of Plaintiff's ability to perform her job as well as testimony from Mr. Gessner and Mr. Gobin that they were unaware of Plaintiff's condition and her accommodations until she raised concerns about moving to the second floor provide ample evidence from which a reasonable jury could infer that Defendant's newfound knowledge of Plaintiff's disability formed the impetus for its adverse employment action.

In conclusion, the court finds that Plaintiff has raised genuine issues of material fact as to whether she suffered discrimination based on her disability.  <u>See</u> <u>Calero-Cerezo v. U.S. Dept. of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004) (holding that Plaintiff must present evidence that is "sufficiently strong to support a verdict in her favor").  The court will thus deny Defendant's motion for summary judgment on Counts I and IV.

C.    <u>Counts II and V: Failure to Accommodate</u>.

A claim for failure to accommodate requires a plaintiff to show that she was both disabled and able to perform the essential functions of her job despite the disability either with or without reasonable accommodations.  <u>Enica v.</u>

<u>Principi</u>, 544 F.3d 328, 339 (1st Cir. 2008). Further, a plaintiff must prove that her employer was aware of her disability and denied specific, reasonable accommodations. <u>Id.</u>

Curiously, Defendant conflated Plaintiff's failure-to-accommodate claims with her retaliation claims and offered no argument to support its motion for summary judgment on Counts II and V. As above, the court's own review of the evidence leads it to the inescapable conclusion that a jury could find that Defendant failed to accommodate Plaintiff in violation of the ADA.

The undisputed facts demonstrate that Plaintiff was performing the essential functions of her job with the informal accommodations that had been in place since January 2005 until the day that she was placed on leave. Upon learning of Plaintiff's diagnosis and these informal accommodations, Mr. Gessner refused to enforce them and then removed Plaintiff from her job. It is true that a reasonable jury might also conclude that Mr. Gessner's conduct was justified, particularly once he had received Dr. Krinsky's report opining that Plaintiff could not perform her job, but Plaintiff is entitled to have a jury weigh the conflicting evidence, not the court.

D.    <u>Counts III and VI: Retaliation Claims</u>.

Plaintiff has alleged that Defendant retaliated against her in violation of 42 U.S.C. § 2000e-3 and Mass. Gen. Laws ch. 151B, § 4(4). To establish a prima facie claim of retaliation, Plaintiff must demonstrate that she engaged in protected activity and suffered an adverse employment action as a result. Bennett v. Saint-Gobain Corp., 507 F.3d 23, 32 (1st Cir. 2007). Plaintiff easily surmounts this rather minimal, threshold hurdle. Undeniably, her request for accommodations was a protected activity that prompted Defendant's eventual adverse employment act of placing her on short-term disability leave.

In light of Plaintiff's prima facie showing, the burden shifts to Defendant to provide a legitimate, non-retaliatory reason for its adverse employment action. Calero-Cerezo, 355 F.3d at 26. Should Defendant so provide, under the familiar McDonnell Douglas burden-shifting framework, Plaintiff must then show that this allegedly legitimate reason was a pretext and that the adverse employment action was, in fact, a result of Defendant's intent to retaliate against her for asserting her rights under the ADA. Id.

In this analysis, it is important to bear in mind the specific nature of the discrimination alleged in these counts. Plaintiff's claim shifts from a claim of straightforward disability discrimination (as to which, the

court has found, she is entitled to jury consideration) to the separate question whether she also suffered discrimination for asserting her rights.  As to this independent claim, further analysis reveals that the record is insufficient.

Defendant concedes that it placed Plaintiff on short-term disability leave because of Mr. Gessner's concerns about the impact of her medical condition on her ability to perform her job safely.  There is not the remotest hint that he acted out of a desire to retaliate against her seeking accommodations.  As Mr. Gessner wrote in his memorandum documenting the April 30, 2007, meeting, "I explained to Nicole that I am concerned for her personal safety."  (Dkt. No. 35, Ex. 21.)  Whether or not this concern constituted a legitimate reason for its conduct, Plaintiff has pointed to no evidence that suggests even a wisp of retaliatory animus on the part of Defendant.  To the contrary, the evidence shows that on Plaintiff's last day of employment, Defendant had requested but not yet received a medical opinion concerning Plaintiff's limitations and their impact on her ability to work.  Without passing judgment on the propriety of Defendant's conduct, the court cannot identify a single fact tending to show that Defendant harbored any animus toward Plaintiff based on her invocation of her rights under

the ADA.  See <u>Collazo v. Bristol-Myers Squibb Mfg.</u>, 617 F.3d
39, 50 (1st Cir. 2010) (observing that to withstand summary
judgment, "[a]ll a plaintiff has to do is raise a genuine
issue of fact as to whether retaliation motivated the
adverse employment action").  Thus, Defendant's motion for
summary judgment on Plaintiff's retaliation claims, Counts
III and VI, will be allowed.

<div align="center">

IV.   <u>CONCLUSION</u>

</div>

For the foregoing reasons, Defendant's motion for
summary judgment (Dkt. No. 30) is hereby DENIED as to Counts
I, II, IV, and V, and hereby ALLOWED as to Counts III and
VI.  The clerk will set the matter for a final pretrial
conference.

It is So Ordered.

<div style="margin-left: 50%">

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

</div>